UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DAWN BREWSTER,

        Plaintiff,

        v.                                      Case No. 06-C-0175

CNH AMERICA LLC and
STROM ENGINEERING CORPORATION,

        Defendants.

**DECISION AND ORDER ON DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT**

## I. PROCEDURAL BACKGROUND

On or about June 30, 2005, the plaintiff, Dawn Brewster ("Brewster"), filed charges of discrimination with the United States Equal Employment Opportunity Commission against the defendants CNH America LLC ("CNH") and Strom Engineering Corporation ("Strom"). Brewster alleged that she was sexually harassed by CNH employee, Scott Conner ("Conner"), and that CNH and Strom had subjected her to a hostile work environment by not adequately protecting her from Conner's alleged sexual harassment. The EEOC notified Brewster of her right to sue on November 28, 2005.

On February 10, 2006, Brewster filed this action, alleging that CNH and Strom subjected her to a hostile work environment in violation of Sections 703 and 704 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2 ("Title VII"). Specifically, Brewster alleges that "[t]hroughout [her] employment with Defendant CNH and Defendant Strom Plaintiff was treated less

favorably based upon her sex, harassed based upon her sex, forced to work in a hostile work environment, retaliated against for opposing discriminatory practices in the workplace, and constructively discharged." (Compl. at 2.)

In accordance with the court's June 20, 2007 Second Amended Scheduling Order, on September 28, 2007, CNH and Strom each filed a motion for summary judgment. On October 29, 2007, Brewster filed her response to both motions. On November 13, 2007, CNH and Strom each filed a reply. Accordingly, the motions are fully briefed and are ready for resolution.

## II. FACTUAL BACKGROUND

CNH manufactures agricultural equipment and has facilities located throughout the United States. (CNH Proposed Findings of Fact "PFOF" ¶ 3.) Strom provides temporary staffing to local and national businesses. (Strom PFOF ¶ 1.) On March 25, 2004, CNH was preparing to renegotiate its collective bargaining agreement with the United Auto Workers, which represents approximately 350 CNH employees at CNH's Racine, Wisconsin manufacturing operation ("Racine Facility"). (CNH PFOF ¶ 13.) CNH contracted with Strom to provide qualified personnel to CNH in the event of a work stoppage. (CNH PFOF ¶ 13.)

The Services Agreement between CNH and Strom stated the parties' intention that an "independent contractor" relationship be formed between CNH and Strom, whereby Strom would furnish CNH with certain of its employees, pre-selected by Strom, in the event of a work stoppage at the Racine Facility. (CNH PFOF ¶ 14.) The Services Agreement expressly stated that the Strom employees provided to CNH would remain Strom employees at all times and would not be considered, or treated as, CNH employees. (CNH PFOF ¶ 15.) The Services Agreement also provided that Strom did not have authority or control over CNH employees nor was Strom

2

responsible for any term or condition of employment of CNH employees. (Strom PFOF ¶ 21.) The Services Agreement required Strom to notify, in writing, its employees assigned to the Racine Facility during the work stoppage that their employment is due to a strike, that their employment with Strom is temporary and limited to the duration of any work stoppage at CNH, that they are not employed by CNH, and that they have no right of continued employment at any CNH facility. (CNH PFOF ¶ 17.)

A work stoppage began at the Racine Facility in October 2004, and Strom began supplying employees to the Racine Facility pursuant to the Services Agreement. (Strom PFOF ¶ 18.) Consistent with its contractual obligation, Strom notified all of its employees assigned to the Racine Facility that their assignment was of a temporary nature and was limited to the duration of the work stoppage at CNH. (CNH PFOF ¶ 19.) At all times Strom retained exclusive control and final authority over its employees assigned to the Racine Facility, (CNH PFOF ¶ 20), and CNH personnel understood that they could not discipline Strom employees or unilaterally reassign Strom employees, (CNH PFOF ¶ 21). Strom also performed all recruitment, pre-employment screening, immigration verification, hiring, layoff, discharge and discipline of its employees who were assigned to the Racine Facility, (CNH PFOF ¶ 22), and provided on-site administration and coordination of its employees who were assigned to the Racine Facility, (CNH PFOF ¶ 23).

On November 16, 2004, Brewster accepted a temporary assignment from Strom to work at the Racine Facility. (Strom PFOF ¶ 37.) Brewster signed Strom's Project Assignment Agreement where she acknowledged the temporary nature of her position and Strom's sexual harassment policy. (Strom PFOF ¶ 38.) Brewster had signed the same agreement on at least two other occasions when she had accepted other temporary jobs from Strom. (Strom PFOF ¶¶ 28-36.)

3

Brewster was originally assigned to work in the tube line assembling gears at the Racine Facility. Within two weeks, she was reassigned to work on the transmission assembly line. (Strom PFOF ¶ 41.) Scott Conner ("Conner"), a CNH Senior Process Engineer, and other CNH personnel were assigned by CNH to oversee the transmission assembly line during the work stoppage to make sure that the Strom employees did not make mistakes and that the quality of the assembly work was up to standards. On occasion, Conner also worked on the assembly line, if necessary, during the work stoppage. (CNH PFOF ¶ 43; Strom PFOF ¶ 44.)

Brewster alleges that when she was reassigned to the transmission assembly line Conner began making inappropriate comments to her. (Strom PFOF ¶ 42.) Specifically, Brewster alleges that Conner's first inappropriate act toward Brewster occurred almost immediately after Brewster's transfer to the assembly line when Conner approached her and asked her for a hug or a kiss. (Brewster PFOF ¶ 10.) Brewster alleges that she objected to Conner's conduct at that time, told him not to speak to her in that manner and told him that she was a happily married women. (Brewster PFOF ¶ 11; Strom PFOF ¶ 48.) In response, Conner told her that "he respected that." (Strom PFOF ¶ 28.) Believing that the issue was resolved, Brewster did not report the incident to anyone at Strom or CNH. (Strom PFOF ¶ 49.)

Brewster further alleges that, within a day or so after the initial incident, Conner's inappropriate behavior began again[1] and continued until the last day of her employment, February 22, 2005. (Brewster PFOF ¶¶ 12, 22, 23, 31, 32, 37, 109.) During that time, Brewster alleges that

---

[1] Brewster asserts that she then "immediately complained to Clint Pullen," the Project Coordinator, "about the statements Conner had been making to her on the tube line." (Brewster PFOF ¶ 14.) However, Pullen did not begin working in the capacity of the Project Coordinator for Strom until on or around February 1, 2005. (Brewster PFOF ¶ 19; Strom PFOF ¶ 62.)

4

Conner made numerous comments about her buttocks including that he loved to watch Brewster "bend over," that she had a "nice ass," and that she had a nice set of "commode grippers." (Brewster PFOF ¶¶ 12, 26.) Brewster also alleges that during that time Conner often sat by her work station and made inappropriate comments to her, including, but not limited to: he liked the way she looked in what she was wearing; he liked the way she smelled; he liked watching her work; and, he liked watching her use the tools. (Brewster Resp. to Strom's PFOF ¶ 47.) Also during that time, Brewster alleges that Conner would often wink or smile at her; he repeatedly asked her out for drinks and dinner; and once he asked if she could get away from her husband on New Year's Eve to be with him. Additionally, Brewster alleges that Conner once told Curt Bruder ("Bruder"), one of Brewster's co-workers, that he should take Brewster to the end of the axle line, bend her over an axle and give it to her once for him. (Brewster Resp. to Strom PFOF ¶ 47.) Brewster also alleges that Conner inappropriately touched her on multiple occasions by "rubbing her shoulders, running his finger up her spine, running his hands up her sides, rubbing his body against her buttocks, hitting her on the buttocks, and, on one occasion, taking a tube and running it between her legs." (Brewster PFOF ¶ 28.) Both Strom and CNH allege that these instances of physical touching were investigated and that they were never substantiated. (Strom PFOF ¶ 22; CNH PFOF ¶ 50.)

The parties seem to agree that Brewster filed multiple complaints with Strom's on-site representative Dwayne Baumgartner ("Baumgartner"), Strom project manager Clint Pullen ("Pullen"), and Strom floor supervisor Glenn Williams ("Williams"). However, it is unclear to the court when and to whom these complaints were lodged[2] and whether the Strom representatives knew

---

[2] The findings of fact filed by all of the parties seem to contradict each other as to the exact timing of Brewster's complaints to Strom representatives, the content of those complaints, and the dates the complaints were lodged. Brewster's timeline appears especially confused, as Brewster, on at least

5

or should have known that Conner's comments and behavior were sexual in nature and not just "inappropriate."[3]

For seven working days between February 13, 2005 and February 20, 2005, Brewster took a one-week trip to Ramona, California. Brewster claims that she told Pullen that she was taking the week off "to let things cool down with Conner and her complaints," and that Pullen agreed that taking time off was a good idea. (Brewster PFOF ¶¶ 46-47.) Strom contends that it believed that Brewster took the trip to be with her grandmother who needed surgery. (Strom Resp. to Brewster PFOF ¶ 46.) Regardless, Brewster returned to the Racine Facility for work on February 21, 2005. (Strom PFOF ¶ 93.) On her first day back, Brewster alleges that Conner, again, made inappropriate comments to Brewster and rubbed her shoulders. (Brewster PFOF ¶ 49.) That evening, Brewster told Williams that "I'm leaving at the end of this week and I don't know if I'm coming back because I can't put up with this." She claims that Williams told her "Okay. So you're saying that you're done at the end of this week?" and she replied, "I can't tolerate this anymore," to which, Williams responded "Okay. That's fine." (Strom PFOF ¶ 97.)

The next day, February 22, 2005, Brewster claims that Conner squeezed her shoulder and then dropped his arms and let his hands down the sides of her breasts. (Strom ¶ 77; Brewster PFOF ¶ 28.) Brewster contends that she threw her tool on the floor and walked away, leaving Conner

---

two occasions states that she reported Conner's behavior to individuals on dates when it is undisputed that the individuals were not yet working at the Racine Facility.

[3] Pullen specifically recalls Brewster lodging at least one complaint that Conner had been speaking inappropriately to her in the workplace. (Brewster PFOF ¶ 20; Strom PFOF ¶ 75.) However, at the time, Pullen alleges that he believed that Conner was just "making fun of [Brewster]." (Strom PFOF ¶ 75.) Pullen, who had previously worked with Brewster at a different job site, was aware the Brewster's co-workers had made "fat jokes" about her in the past. (Strom PFOF ¶ 72.)

6

standing behind. (Strom PFOF ¶ 100.) Brewster went immediately to the maintenance department to see her husband, who was also working at CNH. Her husband was not there. (Strom PFOF ¶ 101.) Kevin Ford, a Strom maintenance employee, offered to give her a ride on a maintenance cart down to the main office to talk to the Strom personnel. (Strom PFOF ¶ 101.) In the main office, Brewster approached Baumgartner and told him that Conner had touched her and that she would not put up with it. Strom Vice President Jim Corrigan ("Corrigan"), who was also in the office at that time, told Brewster that she did not have to tolerate such conduct. (Strom PFOF ¶ 103.) Baumgartner told her to write a statement about what happened, and Brewster complied. (Strom PFOF ¶¶ 105, 106.)

After Brewster reported the incident to Baumgartner and Corrigan, Pullen suggested to Brewster that she work the rest of the day in the office. (Strom PFOF ¶ 113.) Brewster claims that while she was in the office Conner came in several times. On the first occasion she claims that Conner came up to her in front of Corrigan, Baumgartner, Pullen, and Terry Anderson, put his hand on her shoulder, bent down into her face and said "What's the matter, Cupcake? Did somebody do something to upset you, Honey or Darling . . .?" (Strom PFOF ¶ 114.) Brewster alleges that Baumgartner told Conner that Brewster wasn't feeling very well and that Conner should go back to his area. Conner then left. (Strom PFOF ¶ 115.) Brewster alleges that Conner later returned to the office causing Brewster to run out of the office and into the batheroom, where she calmed herself and washed her face. (Strom PFOF ¶ 116.) When she emerged from the bathroom, Brewster alleges that Conner was standing across the hallway waiting for her. (Strom PFOF ¶ 117.) Brewster went back into the office and closed the door. On her way back to the office, Brewster ran into Pullen and told him that Conner was following her. (Strom PFOF ¶ 119.) Pullen offered to find another spot to

7

reassign Brewster, but Brewster declined and asked to go home. (Strom PFOF ¶ 120.) Brewster alleges she then went into an office across the hall from the main office, and that Conner attempted to come into that room too but was stopped by Pullen. (Strom PFOF ¶¶ 121, 122.) Brewster asked Pullen to call her husband so that he could walk out with her. Pullen did so. Brewster left and never returned to the Racine Facility. (Strom PFOF ¶ 125.) Brewster alleges that she called Pullen by telephone on the evening of February 22, 2005, and informed him that she could no longer work in that environment because Strom and CNH could not protect her from Conner. (Brewster PFOF ¶ 109.) Pullen denies ever having received that phone call. (Brewster PFOF ¶ 110.)

Immediately after Brewster completed her written incident report, Baumgartner provided Laurie Ozbolt ("Ozbolt"), CNH's Human Resource Representative, with a copy of the report. (CNH PFOF ¶ 45.) Ozbolt immediately began an investigation, which included interviews of nine individuals on February 22, 23, and 24, 2005. (CNH PFOF ¶ 46.) Ozbolt met with Brewster twice. Brewster reported that Conner had made inappropriate contact with her that morning, February 22, and the previous day, February 21. Brewster also complained to Ozbolt that Conner had made demeaning comments to her about her weight, including calling her a "fat fucking bitch," that Conner had been making sexually suggestive comments to her since December 2004 and that Conner had once asked her for a hug or kiss. (CNH PFOF ¶ 47.)

Ozbolt also interviewed a number of Strom employees who worked in the area immediately surrounding Brewster's work area – some of whom Brewster had identified as witnesses to the alleged sexual harassment. While several of the co-workers had seen Conner touch Brewster's shoulders, none of them felt his behavior was inappropriate, and at least one employee stated that

8

Conner "puts his hand on everyone's shoulder when they talk to him." (Strom PFOF ¶¶ 81,82, 86) Ozbolt also interviewed Baumgartner and Pullen, as well as Terry Anderson, a CNH Supervisor.

Ozbolt, along with Doug Talbot ("Talbot"), CNH's Plant Human Resource Manager, and Pheonix Rann, Conner's immediate supervisor, interviewed Conner on February 23, 2005. Conner denied inappropriately touching Brewster and also denied making sexually suggestive comments to her. Conner did admit that he had made comments about Brewster's weight, but he denied calling Brewster a "fat fucking bitch." (CNH PFOF ¶ 49.)

Based upon the investigation, Ozbolt concluded that there was no credible, verifiable evidence that Conner had touched Brewster inappropriately or had sexually harassed her. Ozbolt did conclude that Conner had made demeaning comments about women and about Brewster's weight. (CNH PFOF ¶ 50.) Based on Ozbolt's findings, Talbot counseled Conner regarding his inappropriate conduct, informed him that he would be removed from his line responsibilities, restricted him solely to his engineering duties, and warned him that any future conduct of a similar nature would result in his termination from the company. (CNH PFOF ¶ 51.)

### III. STANDARD OF REVIEW

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963

9

amendment). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson*, 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d

10

469, 477 (7th Cir. 1995)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### IV. DISCUSSION

CNH and Strom each filed a motion for summary judgment.

CNH argues that the court should grant summary judgment because:

> (1) it is undisputed that [] Brewster was never an employee of CNH, and an employment relationship between the plaintiff and the defendant is a prerequisite for maintaining a Title VII action; and (2) even if [] Brewster could assert a Title VII claim against CNH . . . there is no dispute of material fact that CNH immediately investigated [] Brewster's February 22, 2005 complaint of sexual harassment against a CNH employee and took appropriate remedial action.

(CNH Br. at 2.)

Strom argues that the court should grant summary judgment because: (1) Brewster failed to establish a prima facie case of a hostile work environment because "there is no evidence that Strom knew or should have known of the alleged harassment and failed to take action to prevent it" and Brewster "fail[ed] to demonstrate that the alleged conduct rises to the level of actionable sexual harassment"; (2) Brewster "failed to utilize Strom's well-established anti-harassment policy"; and (3) Brewster failed to allege any facts to support her claim for retaliation. (Strom Br. 2, 29.)

The court will address each defendant's motion in turn.

11

A. *CNH's Motion for Summary Judgment*

CNH argues that it cannot be held liable under Title VII for its action or inaction in response to Conner's alleged conduct because Brewster was not a CNH employee at the time of the alleged harassment. In the alternative, CNH argues that even if the court determines that Brewster was a CNH employee, the action CNH took to investigate Brewster's complaint was adequate under the law. Brewster failed to address either of CNH's arguments in her response. Because this court finds Brewster was not a CNH employee at the time of the alleged harassment, and such a finding is dispositive of CNH's motion for summary judgment, it need not address CNH's alternative argument.

In order to maintain a Title VII action against a defendant, "a plaintiff must prove the existence of an employment relationship." *Alexander v. Rush North Shore Med. Cntr.*, 101 F.3d 487, 492 (7th Cir. 1996) (quoting *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 380 (7th Cir. 1991)). Title VII defines employee very broadly as "an individual employed by an employer." 42 U.S.C. § 2000e(f). Independent contractors are not protected under Title VII. *Knight*, 950 F.2d at 380.

The Seventh Circuit has adopted the common law test for determining whether an individual is an employee or an independent contractor for purposes of Title VII. *Id*. The test requires the court to consider five factors:

(1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work,

(2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace,

(3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations,

(4) method and form of payment and benefits, and

12

>    (5)    length of job commitment and/or expectations.

*Id*.

Of the several factors to be considered, the employer's right to control is the most important when determining whether an individual is an employee or an independent contractor. *Id*. "[I]f an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." *Id*. at 493 (citations omitted).

Applying the Seventh Circuit's five-factor test here, the undisputed facts demonstrate that Brewster was not an employee of CNH at any time. Rather, at all times relevant to the allegations of the complaint, Brewster was a Strom employee. Additionally, the terms of the Service Agreement and the Project Assignment Agreement, as well as the parties' actual performance under those contracts, indicates that Brewster was not a CNH employee as defined by Title VII.

CNH did not exert sufficient control over Brewster's work to meet the first, and most important, factor in establishing an employment relationship. Consistent with the terms of the Services Agreement and the Project Assignment Agreement, Strom, and not CNH, was solely responsible for controlling virtually all aspects of Brewster's work. (CNH PFOF ¶¶ 20-25.) At the outset, Strom, and not CNH, recruited, hired, trained and assigned Brewster to work at the Racine Facility. The Services Agreement obligated Strom to perform all "recruitment [and] pre-employment screening" of those employees assigned to work at the Racine Facility. (CNH PFOF ¶ 22.) Once Brewster began working at the Racine Facility, Strom, and not CNH, retained the right to discipline, discharge, reassign, set work schedules, grant leave from work, and establish work rules for all its employees, including Brewster, working at the Racine Facility. (CNH PFOF ¶¶ 26, 36.)

13

Accordingly, Strom, and not CNH, was solely responsible for all terms and conditions of Brewster's employment.

Although CNH salaried personnel, like Conner, were available to answer questions and offer instruction on specific assembly methods, pursuant to the Services Agreement, Strom's on-site supervisors retained and exercised the authority to directly supervise their employees. (CNH PFOF ¶¶ 20-25.) Indeed, if Conner, as a CNH employee, had attempted to alter Brewster's job assignment, her Project Assignment Agreement directed her to immediately report such an attempt to her Strom supervisor. (CNH PFOF ¶ 37.)

Strom was also solely responsible for all the costs associated with Brewster's employment. Strom paid all wages, social security taxes, benefits, worker's compensation insurance, unemployment insurance, employer's federal and state income taxes, and Strom also paid for comprehensive general liability insurance coverage. (CNH PFOF ¶ 26.) Strom also set Brewster's rate of pay and monitored her time records. Brewster acknowledged, in writing, that she would not be entitled, nor become entitled, to participate in any of CNH's benefit plans, including, without limitation, vacation, disability, life insurance, S.U.B., attendance bonuses, pre-retirement leave, pension and annuity, accidental death and dismemberment, dental, hospital, surgical, or medical benefits, and Brewster did not, in fact, receive any compensation or benefits from CNH. (CNH PFOF ¶ 36.)

Brewster further acknowledges that her assignment at the Racine Facility was temporary, and she admits that she had no expectation of continued employment. Indeed, the nature of her assignment at the facility was as a strike replacement worker, and she recognized that her assignment may end at any time and with no advance notice. (CNH PFOF ¶¶ 30, 35.)

14

Although not dispositive, an operative contract that explicitly denounces an employment relationship is strong evidence that an employment relationship, for Title VII purposes, does not exist. *See Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 805-06 (7th Cir. 1999) (finding the plaintiff's status as an independent contractor, and therefore not an employee, was "confirmed" by an agreement between the parties expressly referring to the plaintiff as an "independent contractor"); *Taylor v. ADS, Inc.*, 327 F.3d 579, 580-81 (7th Cir. 2003) (relying, in part, on an agreement between the parties that designated the plaintiff as an "independent contractor" when finding that the plaintiff was not an employee). The fact that Brewster was not CNH's employee is supported by both the Services Agreement between CNH and Strom and the Project Assignment Agreement that Brewster signed upon accepting the temporary position at the Racine Facility. The Services Agreement expressly provides that "[a]ll personnel provided to CNH by Strom pursuant to the Agreement shall be employed solely by Strom . . ., and shall not be considered employees of, nor shall they be employees of, CNH for any purpose" (Strom's Ex. F at 7.) None of the parties suggest that the Services Agreement was not enforced. The Project Assignment Agreement, which Brewster read and signed upon beginning work at the Racine Facility expressly states that "I understand that I am an employee of Strom Engineering Corporation, on assignment to one of their clients." "I understand that this is a temporary position and that no promise of employment with the client company has been offered or implied." (Strom's Ex. E at1.) Both Agreements document the intent of Strom and CNH to engage in a business/client relationship whereby Strom employed personnel to fill in for CNH's employees while they were on strike. Strom and CNH both intended for Brewster to remain Strom's employee and Strom's alone. No party indicates that either Agreement was not enforced to the letter.

15

Analyzing Brewster's relationship with CNH under the five-factor common law test, the court determines that their relationship was not one of employee/employer. This finding is further strengthened by the Service Agreement signed by CNH and Strom and the Project Assignment Agreement signed by Brewster at the start of her assignment at the Racine Facility.

Curiously, Brewster's response to CNH's motion for summary judgment never addresses the employee/employer relationship necessary to successfully file a claim against a defendant under Title VII, and instead, emphasizes the evidence indicating that Conner sexually harassed Brewster at work. Regardless of whether such harassment actually occurred, Brewster must first establish that she was CNH's employee, as defined by Title VII, in order to go forward with her claim. Without establishing such a relationship, CNH cannot be held liable for Conner's behavior–regardless of how distasteful it may have been.

Looking at all the undisputed facts in the light most favorable to Brewster, this court cannot find an employee/employer relationship to have existed between CNH and Brewster. Therefore, CNH's motion for summary judgment will be granted.

B. *Strom's Motion for Summary Judgment*

Strom argues that the court is obliged to grant summary judgment as to Brewster's hostile work environment claim because Brewster cannot establish a prima facie case for such a claim or, in the alternative, because Brewster failed to make use of Strom's anti-harassment policy. Additionally, Strom contends that the court is required to grant summary judgment as to Brewster's retaliation claim because it alleges that Brewster has failed to put forth any facts supporting such a claim. Because the court finds issues of material fact remain as to both claims, the court must deny Strom's motion for summary judgment.

16

After combing through the extensive proposed findings of fact submitted by each party, the court simply cannot determine what facts the parties agree to in regard to either of Brewster's claims. Strom, as required by Civil L.R. 56.2(a), submitted 149 proposed findings of fact to the court. In response, and in accordance with Civil L.R. 56.2(b), Brewster responded to Strom's proposed findings of fact. However, Brewster responded to and contested only nine (9) of Strom's 149 findings. Brewster then chose to file her own proposed findings of fact, pursuant to Civil L.R. 56.2(b)(2), containing 132 additional findings. Strom responded to and contested only fourteen (14) of Brewster's additional proposed findings of fact. Under Civil L.R. 56.2(e), there is no genuine material issue as to any proposed finding of fact to which no response is set out. Accordingly, this court should be able to accept as true those proposed findings of fact that either Brewster or Strom did not contest.

Frustratingly for the court, however, a number of Strom's uncontested proposed findings of fact and Brewster's uncontested additional proposed findings of fact contradict each other. For instance, Strom states in its proposed findings of fact that "Plaintiff never told Pullen that Conner was harassing her." (Strom PFOF ¶ 74.) Brewster did not contest Strom's statement. (*See* Brewster's Resp. to Strom's PFOF.) Therefore, under the local rules, this court is required to accept that fact as true. However, Brewster states in her additional proposed findings of fact that "Brewster complained of sexual harassment to Clint Pullen, Dwayne Baumgartner, and Glenn Williams." (Brewster PFOF ¶ 43.) Strom did not respond to Brewster's statement. Accordingly, under the local rules, the court must also accept Brewster's statement as true. As the two statements are at odds with each other, this is simply not possible.

17

Other uncontested facts, while not *directly* contradictory, appear nonsensical. For instance, Brewster states in her additional proposed findings of fact that:

> Connor [sic] touched Brewster inappropriately. Connor [sic] rubbed Brewster's shoulders poked her in the small of the back and in the sides, ran his finger up her spine, ran his hands up her sides, rubbed his body against her buttocks, hit her on the buttocks, and, on one occasion, took a tube and ran it between her legs.

(Brewster PFOF ¶ 28.) In its response, Strom did not contest this proposed finding of fact. However, in Strom's proposed findings of fact, Strom asserts that CNH's investigation of Conner's behavior concluded that "there was no reason to believe that Conner had touched anyone inappropriately." (Strom PFOF ¶ 135.) Brewster does not contest this proposed fact. To be sure, perhaps these two sets of uncontested facts can somehow be reconciled with each other. Perhaps Conner could have touched Brewster inappropriately, while at the same time CNH's investigation could have concluded that no such behavior occurred. However, Strom's proposed finding of fact strongly suggests that Strom does in fact contest Brewster's assertion that such physical contact occurred. Such incongruity, between supposedly agreed upon facts, appears throughout the parties' submissions. As a result, the factual scenario presented to the court is unclear and nonsensical; so much so, that the court finds it would be impossible to enter a final judgment based upon such recitation of the facts.

Neither party is entirely free from fault in their nonsensical recitation of the facts. Portions of Brewster's proposed findings of fact, in particular, seem confused. For instance, in her additional proposed findings of fact, Brewster claims that Conner's first inappropriate comment to her, a request for a "hug or a kiss," occurred in or around the third week of her employment, approximately the beginning of December. (Brewster PFOF ¶ 10.) She then asserts that only "a day or so" later Conner again made inappropriate comments to her, stating that he loved to watch her "bend over" and that she had a "nice ass." (Brewster PFOF ¶ 12.) Brewster asserts that she then immediately reported

18

Conner's behavior to Pullen. (Brewster PFOF ¶ 15.) According to Brewster's timeline, this report would have been made within the first two weeks of December 2005. However, neither party contests that Pullen did not begin working at the Racine Facility until February 1, 2006. (Brewster PFOF ¶ 20; Strom PFOF ¶ 62.) Such a discrepancy in time does not provide the court with any clarity as to whom or when Brewster may have reported any of Conner's allegedly inappropriate behaviors.

Many of these contradictory and confusing statements go to the heart of Brewster's claims. Indeed, whether Conner physically touched Brewster, when Brewster reported Conner's behavior to a Strom representative, and whether Brewster made it known that Conner was sexually harassing her are issues that go to the very heart of this case. Perhaps there is some way that the court could strain itself and attempt to put together a timeline that makes sense on paper. But, there is simply no reason to believe, with any degree of confidence, that such an undertaking would culminate in a just result. Without clarity on these issues, and others left unclear after the parties' briefing, too many facts remain in dispute, or are at least unclear to the court, to grant Strom's motion for summary judgment. A jury is going to have to sort out the facts.

**NOW THEREFORE IT IS ORDERED** that CNH's motion for summary judgment (dkt #36) be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that Strom's motion for summary judgment (dkt # 27) be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that a status conference be conducted on Wednesday, January 23, 2008, at 10:15 a.m. in Room 253 of the U.S. Courthouse, 517 E. Wisconsin Avenue, Milwaukee,

WI 53202, for the purpose of discussing with the parties the further processing of this case to final judgment.

**SO ORDERED** this 9th day of January 2008, in Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge